**Lonnie B. WALKER, Appellant,**

v.

**George T. BARROW, Receiver, Appellee.**

**No. 15673.**

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Feb. 18, 1971.

Rehearing Denied March 11, 1971.

C. Mann Gregg, Texas City, for appellant.

Mills, Shirley, McMicken & Eckel, John Eckel, Galveston, for appellee.

BELL, Chief Justice.

This is a trespass to try title suit brought by appellee to recover title and possession of the following described tract of land:

"All of Lot 6 of the Subdivision M of Kohfeldt's Resubdivision of the Hamlet Ferguson Survey, Abstract 63, containing ten acres, more or less, as recorded in Volume 245, pages 283–290 of the Deed Records of Galveston County, Texas."

The property is also sometimes described as: "All of Block 142 and all of Block 143 of Kohfeldt's Second Addition to Texas City, containing ten acres, more or less,

located in Galveston County, Texas." The lot contained about ten acres.

Appellee was appointed receiver by the 151st District Court of Harris County with authority to sell the land and divide the proceeds among the heirs of R. S. Wootton. He was given specific authority to take possession and to file any necessary suit to recover possession and title. Suit was filed in the District Court of Galveston County May 4, 1967, against appellant. Appellee relied on the record title in the Wootton heirs and appellant asserted title acquired by virtue of the ten year statute of limitation.

The jury found in response to Special Issue No. 1 that appellant had had peaceable adverse possession, cultivating, using or enjoying same for a period of ten consecutive years or longer prior to the filing of this suit on May 4, 1967. The other issue submitted was a rental issue and is not material to a disposition of this appeal.

The trial court granted appellee's motion for judgment non obstante veredicto, it being determined there was no evidence to support the jury's answer to Special Issue No. 1, and that appellee had established record title in the Wootton heirs.

In determining whether there was evidence of probative force to support the jury's answers we must view the evidence most favorably to the answers and consider only the evidence that supports them. If so viewing the evidence the reasonable mind could reach the conclusion reached by the jury, a court may not disregard those answers and render judgment contrary to them.

The tract of land lies in the form of a square. It is situated in Texas City. It is bounded on the west by a drainage ditch, on the north by 3rd Avenue N., which is a shell road, on the east by 21st Street (this street is also referred to as 31st Street), an asphalt street, and on the south by 1st Avenue N., a shell road. For many years prior to 1955 or 1956 the land had been un-used. In 1955 it was covered with high brush and bloodweed. Around the edges were embankments of dirt, estimated in the record to be about four feet high. Appellant's home is immediately across 1st Avenue N. from the tract involved. It was stipulated that appellant purchased this home August 28, 1955.

Appellant testified he previously worked for Union Carbide. In 1954 he got acid in his lung. In 1956 he had a heart attack. He first got interested in the property when he got sick. In 1956 he put some horses on it. When asked if he had the property fenced, he replied, "Yes, I went over and I tried to find out who the property belonged to. Nobody could tell me. They told me it had been laying out for years. I couldn't find anything about it so I went out there, I figured if it belonged to someone, they would come contact me, I could make some agreement with them."

Appellant was asked if he put a fence up all at once or over a period of time. He stated, "I checked it over. At first you couldn't get in to fence it, it was so grown up, I don't know what they call them, kind of willow bushes that grow seven or eight foot tall * * * there were places you couldn't even walk your horse in there, horses would get hung up in the brush, so I fenced the majority of it when I got the way cleared out." The first fence was of two strands of barbed wire strung on posts about 18 feet apart. He didn't get all of the weeds and heavy brush cleared until after Carla. (Carla, the storm, occurred in September, 1961.) Appellant was sick and worked on it as long as he could manage. He started installation of the fence in 1956. Appellant was asked the following question by his counsel and gave the following answer:

"Q When you started using the property after you discovered no one was using it, claiming it, so far as you know, did you move on the property with the intention of making it your own?

"A Yes, I was unable to find out who it belonged to other than the Wootton Estate. I was unable to contact anyone in the Wootton Estate."

Appellant did not contact the taxing authorities until after he got a letter about the property from Neugent & Lilienstern, attorneys in Texas City. This letter was received in 1965. Another letter was received from Mr. Barrow in 1966. After receiving the first letter he checked with the appropriate taxing authorities. Taxes had never been paid. Since he has claimed the property he has paid some taxes to the County. In 1956 he moved three horses on the property. Also he had some cows and chickens. He completed mowing the tract after Carla. He built a windbreak or stall for horses. He drilled a water well in 1956. He had a hand pump and later an electric pump. There was an old bath tub used as a water trough. 31st Street, or 21st Street, was opened in 1963 or 1964. There was, prior to this a fence along the east side of the tract toward 31st Street. He put a chain link gate in the fence in 1968. Prior to that there was a wire gap. He put the stalls on the property in 1956. He built an electric fence after Carla. He has planted trees, coastal Bermuda grass and Johnson grass.

Appellant's counsel asked these questions and appellant gave the following answers:

"Q Has anyone ever come to you in person and made a claim with reference to ownership of the property. * * *?

"A. No, sir.

"Q And that is from the time you first commenced claiming ownership in 1956 to the present?

"A Yes."

On cross-examination he testified he left Carbide in 1956 when he had a heart attack. The following questions were asked and answers given:

"Q And you testified that when you first started in that if the owner had come out there, or you were figuring if somebody came out there, you would make some kind of agreement with him?

"A Yes, I believe I would have, if he had a deed or something showing he was owner of that property.

"Q Thank you, sir. This was back in '56, '57?

"A Yes, sir back in '56 when I started using it."

Where there were the mounds of dirt along the road ditches the fences were behind the dirt. The fence would be hard to see unless you walked out on the property. You could see some of the posts over the dirt when on the road. The first fence was 3 or 4 feet high. The dirt was about 4 feet high. An electric fence was put up after Carla.

Appellant's county tax rendition sheet for 1967 listed his home as the only property owned or claimed by him.

Appellant testified he did not think that he discussed with Mr. Lilienstern the possibility of a lease. He said he could have but he did not remember it, because it was too far back and he wasn't going to swear he did or did not. He stated that in 1965 he probably would have considered leasing the property if the claiming rightful owner had clear title.

Appellant testified he got the property completely cleared about four years before trial in January, 1970.

Appellant further testified he began use of the property and fenced it in the spring of 1956. The following questions were asked by appellee's counsel and answers given:

"Q * * * when you first started clearing it, you didn't know who it belonged to?

"A No, sir.

"Q And you weren't claiming it as yours at that time?

"A Well, yes, sir, I was claiming it so far as keeping it under fence, keeping it clean.

"Q Were you trying to take it away from anyone at that time?

"A Wasn't anyone to take it away from, didn't know who it belonged to.

"Q In other words, at that time you were not really thinking about taking it away from anyone?

"A I don't think I was at that time. I had it laying under fence and felt like it was mine.

"Q Now, when did you start thinking about taking it way from anyone?

"A I never actually thought about taking it away from anyone. I felt, like I say again, like I made a statement, it was my land.

"Q But you were never trying to take ownership or title from the record owner?

"A No, sir, I never did try.

"Q Are you saying if the record owner came along, that you would get off of it?

"A I believe I made the statement if the record owner came along I would try to make a deal with him to lease it or rent it at that time.

"Q My point is at some time from the point you first got the land up until suit was filed, did you change your thinking on it so that, say * * * for example when you got those letters did you change your thinking that you were no longer, after that time, willing to make a deal, willing to lease it?

"A Up until I got the letters?

"Q Yes.

"A No, like I say again, I wanted the record title, something that was positive proof that they were the record owners.

"Q You would have leased it after you got those letters?

"A No, sir, not after I got the letters, because I had had it a long time. If you rent a piece of property so many years, you feel like it is home, even though you might have been renting it.

"Q That's what I am getting at. In 1965, or thereabouts, I believe Mr. Lilienstern's letter was dated 1965, at that time you had changed your thinking.

"A Yes, sir.

"Q You felt you were no longer willing to lease it from someone?

"A No, sir, I wasn't willing then."

The testimony above noted is what appellant testified to on trial. He had given a deposition in January, 1968. Much of it was read in evidence as original evidence. At one point he was asked when he actually began to try to take the land away and he replied, "right after I got it cleared and began to get threatening letters from two individuals I didn't even know. They have no record anywhere, where they come in as heirs of the land. I don't know the gentlemen. I have never met them." (These were the letters from Lilienstern in 1965 and Barrow in 1966.) He stated that he had some horses in east Texas and when he moved to his home he saw this open pasture and wanted to put his horses there. After inquiry as to who owned it, so he could lease or rent it, he was unable to find out who owned it so he "just went out there and fenced it and claimed it, and started using it." His only inquiry as to ownership was at the City tax office. He was told the Wootton heirs owned it but no one knew how to contact them. Someone at that office told him to use it. At

that time he didn't even have in mind trying to take it away from anyone. He just wanted a place where he could pasture his horses. This was in 1956. He first brought the horses down in May or June, 1957. He built the fence before he brought them down. He built a two-stall barn just before he brought the horses down. He has rebuilt it two or three times. There has been no time when he did not have horses or cows in there. He has always had cows in there. He has also had chickens. He started putting the cows in there in 1960. He started clearing the property in 1957. Three or four months before this he started to look at the land. At this time if he had known who to negotiate with he believes he would have done so. If someone had turned up and said they were the owner he would have asked if they would lease it and for how much. He stated he got the letters previously mentioned and later read a clipping from the newspaper about the case of Langford v. Carter (this was the case in which Barrow was appointed and which involved who the Wootton heirs were). He was then asked the following question and gave the following answer:

"Q And was this the time you decided to claim the land?

"A Yes, I had been claiming the land all along because anybody that went on the land * * * and if they come to my house and asked permission and get the key to go on the property. I have called it my property several times. About two years before the Langford suit I had been trying to get them (the school district authorities) to get the property so I could pay the taxes. I had not tried to pay the taxes before this. They were fixing to foreclose and since I had improved the property and claimed it as my own, I felt I was entitled to it if I could pay the taxes and keep it."

The horses were kept there even before he got the land cleared. Before he had

been to a lot of expense if somebody named Wootton had been able to show they were an heir, he would not dispute any record title shown him. Several years before the deposition he wasn't trying to take it away from anyone, because he knew at that time it didn't belong to any individual one. The last four or five years he planted grass.

On cross-examination in the deposition he stated he entered on the tract "a year or year and a half" after he moved out there. "Say approximately a year." (He moved to his home across from the tract in August, 1955.) This is when he fenced it, that is, when he entered the tract.

Appellant's counsel introduced part of the deposition. In this part appellant testified he couldn't find out from the tax office anyone to get in touch with so he was from the time he started using it holding out to the whole world that it was his. This is what he has been doing ever since he fenced it.

Mr. Welch, a City police officer, testified that he lived near the property from 1955 until October 1956. He moved away and returned in September 1957. He could not remember whether there was a fence there when he moved away. When he returned in 1957 there was a barbed wire fence, though it wasn't much of a fence, running along 1st Avenue N. to the ditch on the west and taking a turn along the ditch. This was in November or December. He did not know how far it went nor did he know whether a fence enclosed the land. The electric fence built after Carla did enclose the lot. He saw Mr. Walker on the property and Walker told him the horses on the property were his. This was in 1957. Welch, with Walker's permission, worked his dogs on the property. Walker would not permit shooting. The property was mowed by someone in 1955. There was a barn, windbreak or shed there in 1957. To the witness' knowledge no one else had claimed ownership of the property except Walker. In 1957 or 1958 it was cleared to the same extent as at the time of trial.

Appellant had testified at one point he built the barbed wire fence and began using the property after he became ill and had left his employment in 1956 and was unable to continue working for Union Carbide. That company's records reflect that in July 1956 appellant was involved in a slight mishap at the plant. The company representative presented a record labeled "Investigation of Lost Time Accident". The record reflected no lost time by appellant. Another record of the company showed that after an apparent heart attack July 13, 1958, appellant ceased work for the company.

The following persons live near the tract in question: Manuel and Raechel Alaniz, Carl Estep, Mr. and Mrs. Lee Lovett and Veda Estep. They had all lived there since about 1955. They all testified there was no fence around the property until an electric fence was built after the storm Carla. While they varied as to the exact year it was built, all said it was after Carla, and most of them said it was built in 1964. The substance of their testimony also is that there was no substantial clearing of the area until after Carla.

■ We are of the view that viewing the evidence most favorably to the appellant and the jury's answer to Special Issue No. 1 that was favorable to appellant, there was no evidence of probative force to support the conclusion that appellant claimed the property adversely to the record owner for ten years prior to the filing of the suit against him. We have above detailed the testimony and it affirmatively shows at most that he had possession with intent to use it until the owner should come along, at which time he would try to lease it. The only time he can be said to have determined to claim it against everyone is in 1965. Suit was filed in 1967. Mere possession and use without intention to claim against the owner will not perfect title by limitation. 5 Lange, Texas Land Titles, Sec. 872, p. 405; Clark v. Kirby, 25 S.W. 1096 (Tex.Civ.App.), no writ. hist.; Whitaker v. Thayer, 38 Tex.Civ.App. 537, 86

S.W. 364, no writ. hist.; Mhoon v. Cain, 77 Tex. 316, 14 S.W. 24; Thompson v. Moor, 14 S.W.2d 803 (Tex.Com.App.).

The trial court correctly disregarded the jury's answer to Special Issue No. 1.

Appellant complains of the admission in evidence of the hereinafter mentioned instruments which, for the most part, were links in appellee's chain of title, either because they were not sufficiently listed in appellee's abstract of title and/or no copy was filed with the court for the proper length of time before trial. Trial commenced January 21, 1970.

The Texas Rules of Civil Procedure 791–794 are the ones dealing with abstracts of title in suits to recover title to land. Rule 792 provides the time for filing after demand is made *and very significantly authorizes the court for good cause shown to grant additional time.* In the case before us the trial court granted appellee additional time and the original abstract of title was filed within the extended time on *December 12, 1967.*

Rule 794 gives the court authority to allow the filing of amended abstracts under the same rules authorizing the amendment of pleadings. In the case before us the trial court permitted the filing of an amended abstract and it was filed March 21, 1968.

On January 22, 1970, the day following the commencement of trial, the court permitted the filing of Items 1, 2 and 3 of appellee's "Second Supplement" to their First Amended Abstract of Title. This Supplement includes certified copies of certain instruments appearing in the Probate Records of Harris County, the copies being certified to by the Harris County Clerk. They were introduced as appellee's Exhibits 7 and 10.

Rule 793 provides in substance that the abstract shall state:

1. The nature and date of each document or written instrument intended to be used as evidence, or,

2. If a contract or conveyance, its date, the parties, the date of the proof of acknowledgment and before what officer made; and,

3. Where recorded, stating the book and page of the record.

4. If not recorded in the county of trial, copies of such instrument, with the names of subscribing witnesses.

As we read the record, it was stipulated at the commencement of trial that counsel might identify deed records that were referred to in the pleadings and the instruments on file in the case and which were on record in the office of the Galveston County Clerk by reading the book and page reference. If opposing counsel wished he might examine the original record in open court and offer it in evidence. Further, if it became necessary on appeal to have a complete copy the court reporter might copy such instruments by xeroxing or otherwise copying the record on file in the County Clerk's office.

Exhibit 7 was offered by appellee and admitted over appellant's objection. The subject of Exhibit 7 was the administration on the Estate of Hamlet Ferguson, Deceased, the person to whom the land was patented. The exhibit was in the form of a certified copy furnished by the County Clerk of Harris County. It showed that S. M. Harris had applied for and been granted letters of administration. It showed he qualified Further, it showed an application to sell the property, authority to sell, a report of the sale to J. C. Cutter and the court's order approving the sale. These proceedings had not, so far as we can tell from the record, been recorded in Galveston County. The proceedings took place in 1856 and 1857.

While a certified copy was not furnished until during the trial when the trial court permitted appellee on January 22, during trial, to file a certified copy, appellee in his First Amended Abstract had given a detailed description of the contents of the instrument and where its various parts were

recorded in the Probate Records of Harris County. Further, it is shown that at the very first part of the trial it was made known to appellant that the Harris County certified copy was being offered.

■ We think any deficiency of the description contained in the abstract filed should have been called to the attention of appellee by motion before trial. There was no error in its admission. Stokes v. Riley, 29 Tex.Civ.App. 373, 68 S.W. 703 n. w. h.

■ Even if there was error in admitting Exhibit 7 in evidence, no harm resulted because Exhibit 8 is the deed from Harris as administrator, conveying the property to J. C. Cutter. This deed was introduced in evidence. The deed was dated September 6, 1859 and was filed for record December 23, 1859 in Galveston County as appears in Volume P, page 290 in the Galveston County Deed Records. It was properly described in appellee's First Amended Abstract. The deed contains recitals of Harris' appointment, the court's order of sale, notice of the sale, the making of the sale, the report of the sale and the court's confirmation. These recitals of fact in this ancient instrument are admissible as proof of the facts recited. 2 McCormick and Ray, Texas Law of Evidence, Second Edition, Sec. 1375, p. 204. These recitals really supply the essential facts contained in Exhibit 7.

■ There was objection to the admission of that part of appellee's Exhibit 10 which is the order of the County Court of Harris County admitting the will of J. C. Cutter to probate and appointing John D. Cutter executor. The original and amended abstracts gave the proper information showing where the will of Cutter was recorded in Volume 74, page 381, Deed Records of Galveston County. In the amended abstract the order of the County Court of Harris County admitting the will to probate and appointing John D. Cutter is listed immediately following the listing of the will. The date of the order is stated as July 21,

1885. The place of recording in Galveston County is not given. The order was, however, recorded in Galveston. The Second Supplement to the First Amended Abstract furnishes a certified copy. There was no error in admitting the order in evidence. Actually, the listing of the will and where it is recorded gives the beginning page 381. It is immediately followed in the records by the order. Together they are found on pages 381–383 of Volume 74. No motion was made before trial complaining of the insufficiency of the listing. Stokes v. Riley, supra.

Even if there were error in admitting the order, no harm is shown. Exhibit 11 is a deed from John D. Cutter, "Executor of the last will of John C. Cutter, deceased," and Mary A. Cutter the "widow and sole residuary legatee" to William M. Peyton. The deed was filed for record January 30, 1889 and is recorded in Volume 70, page 188 of the Galveston County Deed Records. Since it is an ancient document, its recitals are evidence of the facts recited.

Additionally, we feel the following cases support the rule that the court has authority to grant extensions of time to file an abstract and when one has, as here, been filed within the time allowed by the court, the court has discretion to allow amendments. The rule should be applied to promote justice. The court did not abuse its discretion in allowing the amendments. Farhart v. Blackshear, 434 S.W.2d 395 (Tex.Civ.App.), ref., n. r. e.; Keller v. Downey, 161 S.W.2d 803 (Tex.Civ.App.), aff'd 143 Tex. 171, 183 S.W.2d 426; McCraw v. City of Dallas, 420 S.W.2d 793 (Tex.Civ.App.), ref., n. r. e.

Appellant objected to the admission in evidence of appellee's Exhibit 22. This is a properly authenticated copy of an opinion by the Court of Appeals of Kentucky construing the will of R. S. Wooten. The case is entitled "Wooten's Trustee v. Hardy" and is reported in 221 Ky. 338, 298 S.W. 963. The Court of Appeals of Kentucky was the court of last resort in that State. The opinion shows that Wooten was dead; that the primary beneficiary died in 1925, and holds that the residuary legatees took per capita except one legatee took four times the amount of other distributees. The date of the opinion is October 11, 1927. The copy is authenticated in conformity with Article 3731a, Vernon's Ann.Tex.Civ. St., and 28 U.S.C.A. 1738. One ground of objection was that it was hearsay.

It should be noticed it had been on file with the Court of Appeals more than fifteen years. We hold it admissible under Article 3731a, V.A.T.S. and Article 3726a, § 1(a) (3), V.A.T.S., as amended by the Acts of the 59th Texas Legislature in 1965, Chapter 480, p. 994. See also Campbell v. McLaughlin, 280 S.W. 189 (Tex.Com. App.).

Appellant also objected to the introduction of appellee's Exhibits 23 and 24 on the ground that the declarations and findings made in those instruments by the 151st District Court of Harris County were hearsay since he was not a party to the suit in which the judgment was rendered. Exhibit 23 was the judgment originally signed in the case of Langford v. Charles Carter et al. The suit was for the purpose of determining the heirs of Wooten and thus who were the owners of the land and for partition. Exhibit 23 declared who were the owners, ordered partition through sale and appointed appellee Receiver to make the sale. Exhibit 24 is a properly entered nunc pro tunc judgment expressly declaring who were the heirs of Wooten and authorizing appellee to bring this suit. The two instruments as shown in the nunc pro tunc entry constitute one final judgment.

These exhibits were admissible under Article 3726a, Sec. 1a(1) and Section 2, as amended by the 59th Legislature of Texas, Chapter 480, p. 994, and the declaration of heirship in the court's judgment was prima facie true.

Finally, appellant contends appellee as representative of the heirs could

not maintain suit because Wooten's will was admitted to probate in Galveston; Franz Kohfeldt was appointed executor and the estate has not been closed. The will was admitted to probate and said executor appointed in 1922. The evidence shows said executor died in 1938. No contention is made that any successor was ever appointed.

No plea in abatement questioning the capacity of appellee was filed. This being true the trial court did not err in refusing to dismiss on appellant's motion made during the trial of the case. Rule 93 T.R.C.P.; Coakley v. Reising, Tex., 436 S.W.2d 315. Additionally, the rule is that though administration be pending the heirs may sue if the administrator cannot act. Gaston v. Bruton, Tex.Civ.App., 358 S.W.2d 207, writ dism'd.

All points have been considered by us and those not specifically noticed are overruled.

Affirmed.